**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**Tampa Division**

| | |
|---|---|
| ANGELA LYNN MARTIN, On Behalf of Herself and All Others Similarly Situated, | Case No. 8:17-cv-01042-SCB-AAS |
| Plaintiff, | District Judge Susan C. Bucklew Courtroom 10B |
| v. | Magistrate Judge Amanda Arnold Sansone Chambers 10B |
| SCOTTRADE, INC., | |
| Defendant. | Complaint filed May 3, 2017 |

**<u>FIRST AMENDED CLASS ACTION COMPLAINT</u>**

001127458

Plaintiff Angela Lynn Martin ("Plaintiff"), individually and on behalf of all others similarly situated, brings this action against Defendant Scottrade, Inc. ("Scottrade").

## NATURE OF THE ACTION

1.      From September 2013 to February 2014, hackers accessed Scottrade's database and stole and used the personal information, including names, addresses, Social Security numbers, tax identification numbers, employer contact information, personal email addresses, and other sensitive data ("PII"), of more than 4.6 million Scottrade customers ("Data Breach"). Despite the fact that Scottrade collected and stored its customers' highly sensitive PII and knew the PII was valuable to hackers, Scottrade failed to take even the most basic precautions to protect it.

2.      Scottrade is a financial brokerage and bank. To assist it in selling financial services, Scottrade collects a variety of confidential financial and other personal information from its customers. This information is the type that federal and state law requires companies to take security measures to protect. Its customers, including Plaintiff and the other Class members, reasonably expect and believe that Scottrade will take appropriate measures to protect their personal information. Given the sensitivity of the PII Scottrade maintains, Scottrade also contractually obligates itself to using "industry leading security technologies" to protect its customers' information.

3.      For Plaintiff and the other Class members, Scottrade failed to live up to the expectations of its customers and to its contractual and other obligations, resulting in the Data Breach. Scottrade used grossly inadequate data security practices that allowed hackers to easily access and take Plaintiff's and Class members' personal data. In fact,

1

Scottrade's cybersecurity measures were so deficient that it never realized the massive theft occurred until two years later, when federal authorities told them about it. A company following standard data security measures should have taken steps to prevent the Data Breach. Standard data security measures also require that in the event a breach nonetheless occurs, the breach is promptly detected and contained. Here, Scottrade's sloppy practices allowed the hackers to access, view, and use the PII for a variety of schemes that resulted in the loss of millions of dollars.

4.  Scottrade's databases were an easy target and the hackers knew it. As one of the hackers predicted, accessing Scottrade's database "will be a simple hit for us." The hacker was right. After obtaining the login credentials for a single Scottrade account, the hackers were able to access and export the PII without detection over of a period of five months, constituting an inexcusable failure of Scottrade's obligation to take reasonable steps to safeguard this information. Scottrade subsequently admitted there was an intrusion to its network and that "steps to further strengthen our network defenses" were necessary.

5.  Scottrade owed a legal duty to Plaintiff and the other Class members to maintain reasonable and adequate security measures to secure, protect, and safeguard the personal information stored on its network. Scottrade breached that duty by failing to design and implement appropriate firewalls and computer systems, failing to properly and adequately encrypt data, and unnecessarily storing and retaining Plaintiff's and the other Class members' personal information on its inadequately protected network.

00127458

6.    Scottrade has a history of failing to take reasonable data protection measures and thus, was aware of its inadequate cybersecurity before the Data Breach, yet failed to appropriately safeguard the PII. Before the Data Breach, Scottrade's network had been hacked by criminals who used customer account information to conduct fraudulent stock trades. Before the Data Breach, government regulators had even levied fines against Scottrade because of its inadequate cybersecurity procedures and oversight. Despite these repeated failures, Scottrade failed to take reasonable measures to safeguard the PII and never warned Plaintiff and the other Class members that the information they provided to Scottrade was unreasonably susceptible to hackers. To the contrary, Scottrade promised it was adequately safeguarding the PII and contractually obligated itself to do so.

7.    This action seeks to remedy these failings. As a result of the Data Breach, Plaintiff and Class members have spent countless hours reviewing and monitoring their credit and financial accounts to combat identity theft and are paying monthly or annual fees for identity theft and credit monitoring services. Plaintiff brings this action on behalf of herself and all persons whose personal or financial information was disclosed as a result of the Data Breach first disclosed by Scottrade on or about October 2, 2015.

8.    Plaintiff seeks, for herself and the Class, injunctive relief, actual and other economic damages, consequential damages, nominal damages or statutory damages, punitive damages, and attorneys' fees, litigation expenses and costs of suit.

## JURSDICTION AND VENUE

9.    The Court has original jurisdiction over this controversy pursuant to 28 U.S.C. §1332(d)(2). Plaintiff's claims and the claims of the other members of the Class exceed

00127458

$5,000,000 exclusive of interest and costs, and there are numerous Class members who are citizens of States other than Scottrade's States of citizenship.

10.    The Court has personal jurisdiction over Scottrade because it is licensed to conduct business in the State of Florida and, at all relevant times, conducted sufficient business in, had sufficient contacts with, including maintaining sales offices and conducting sales and financial services, and intentionally availed themselves of the laws and markets of Florida, including this County, as to render exercise of jurisdiction by Florida courts permissible. Scottrade also has purposefully availed itself of the benefits of conducting business in the State of Florida by directing activities in the State of Florida, and causing effects in the State of Florida by acts done elsewhere.

11.    Venue is proper in this Court pursuant to 28 U.S.C. §§1391(b)(2) and (3) because at all relevant times, (a) the complained of acts took place within Pasco County, Florida; (b) Scottrade is authorized to conduct (and conducted) business in Pasco County, Florida; (c) Scottrade intentionally availed itself of the laws and markets within Pasco County, Florida; (d) Scottrade conducted (and continues to conduct) substantial business in Pasco County, Florida; and (e) Scottrade is subject to personal jurisdiction in Pasco County, Florida.

## PARTIES

12.    Plaintiff Angela Lynn Martin is a citizen and resident of New Port Richey in Pasco County, Florida. Believing that Scottrade would safeguard her personal information, Ms. Martin provided her PII to Scottrade in connection with her brokerage accounts opened in 2013. Scottrade possessed, and currently possesses, Ms. Martin's PII, which Scottrade was

and is required to take reasonable steps to keep confidential. On or about October 7, 2015, Ms. Martin received an email from Scottrade confirming her PII was compromised and taken from Scottrade's databases between late 2013 and early 2014. Thereafter, one or more data thieves, and their subsequent customers or others coming into possession of the wrongfully disclosed PII, transferred, sold, opened, read, mined and otherwise used Ms. Martin's PII, without her authorization, to their financial benefit and her financial detriment and other harm. Ms. Martin has also been charged and paid Scottrade fees in connection with her Scottrade account, a portion of which were used for data management and security pursuant to the contractual and other obligations of Scottrade. Ms. Martin now closely engages in regular monitoring of her credit and her bank accounts and has spent countless hours doing so.

13.    As a direct and proximate result of Scottrade's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the resulting identity theft and identity fraud[1] inflicted on Plaintiff by one or more unauthorized third parties, Plaintiff also has suffered (and will continue to suffer) economic damages and other injury and harm in the form of the deprivation of the value of her PII, for which there is a well-established national and international market. PII is a valuable property right. Faced with the choice of having her PII disclosed, compromised, transferred, sold, opened, read, mined and otherwise used without her authorization versus selling her PII on the black market and receiving the

---

[1]    According to the United States Government Accounting Office (GAO), the terms "identity theft" or "identity fraud" are broad terms encompassing various types of criminal activities. Identity theft occurs when PII is used to commit fraud or other crimes. These crimes include, *inter alia*, credit card fraud, phone or utilities fraud, bank fraud and government fraud (theft of government services, including medical services).

5

compensation herself, Plaintiff would choose the latter. Plaintiff—not data thieves—should have the exclusive right to monetize her PII. Scottrade's wrongful actions, inaction and omissions, and the resulting Data Breach, deprived her of this right.

14.     As a direct and proximate result of Scottrade's wrongful actions, inaction and omissions, the resulting Data Breach, and the resulting identity theft and identity fraud inflicted on her by one or more unauthorized third parties, Plaintiff received less than she paid for and less than promised or reasonably expected. Scottrade collected Plaintiff's and Class members' PII in order to sell and provide its services. Scottrade pays for data management and data security of the PII from its revenue, including from the fees it receives from performing brokerage and financial services. A portion of the brokerage and financial service fees Plaintiff and Class members paid was for data management and data security. Plaintiff and Class members contracted for brokerage and financial services that included Scottrade's guaranty to safeguard and protect her PII, but instead, received financial and brokerage services lacking these important protections. Despite failing to implement or inadequately implementing policies to safeguard and protect Plaintiff's and Class members' PII, Scottrade has had the beneficial use and enjoyment of the full amount of such payments from Plaintiff and Class members. Plaintiff and Class members overpaid for Scottrade's services. Plaintiff and Class members did not receive the full benefit of their bargain, and instead received Scottrade's brokerage and/or financial services that were less valuable than what they paid for.

15.     As a further direct and proximate result of Scottrade's wrongful actions, inaction and/or omissions, the resulting Data Breach, and the resulting identity theft and

00127458

identity fraud inflicted on them by one or more unauthorized third parties, Plaintiff has suffered (and will continue to suffer) other economic damages and injury and harm, including: (a) an imminent, immediate and continuing increased risk of identity theft and identity fraud; (b) invasion of privacy; (c) breach of the confidentiality of her PII; (d) deprivation of the value of her PII, for which there is a well-established national and international market; (e) failure to receive the full benefit of her bargain as a result of receiving brokerage and financial services that were less valuable than what she paid for; and/or (f) the financial and/or temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages—for which she is entitled to compensation.

16.    Defendant Scottrade is a Missouri corporation with its headquarters and principal place of business in Missouri. Scottrade is a privately owned discount retail brokerage firm headquartered in Town and Country, Missouri and does business in all fifty states, including in the State of Florida. In addition, Scottrade has numerous branch offices located within the State of Florida, including within the County of Pasco.

## PERSONAL IDENTIFICATION INFORMATION
## IS A VALUABLE PROPERTY RIGHT

17.    At a Federal Trade Commission ("FTC") public workshop in 2001, then-Commissioner Orson Swindle described the value of a consumer's PII:

> The use of third party information from public records, information aggregators and even competitors for marketing has become a major facilitator of our retail economy.

///

///

00127458

Even [Federal Reserve] Chairman [Alan] Greenspan suggested here some time ago that it's something on the order of the life blood, the free flow of information.[2]

18.     Though Commissioner Swindle's remarks are more than a decade old, their pertinence has increased over time, as PII functions as a "new form of currency" that supports a $26 billion per year online advertising industry in the United States.[3]

19.     The FTC has also recognized that PII is a new—and valuable—form of currency. In a recent FTC roundtable presentation, another former Commissioner, Pamela Jones Harbour, underscored this point by observing:

Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[4]

20.     Recognizing the high value that consumers place on their PII, many companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information that they share—and who ultimately receives that information. And by making

---

[2]     Federal Trade Commission, *The Information Marketplace: Merging and Exchanging Consumer Data*, *Conference and Workshop*, *Washington D.C.*, 28 (March 13, 2011), available at https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Oct. 10, 2017).

[3]     *See* J. Angwin and W. Steel, *Web's Hot New Commodity: Privacy*, The wall Street Journal, Feb. 28, 2001, available at http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited August 8, 2015).

[4]     Federal Trade Commission, *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable), (Dec. 7, 2009), available at https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable (last visited Oct. 10, 2017).

00127458

the transaction transparent, consumers will make a profit from the surrender of their PII.[5] This business has created a new market for the sale and purchase of this valuable data.[6]

21.    Consumers place a high value not only on their PII, but also on the *privacy* of that data. Researchers have already begun to shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[7]

22.    Notably, one study on website privacy determined that U.S. consumers valued the restriction of improper access to their PII—the very injury at issue here—between $11.33 and $16.58 per website.[8]

23.    The United States Government Accountability Office noted in a June, 2007 report on Data Breaches ("GAO Report") that identity thieves use identifying data such as SSNs to open financial accounts, receive government benefits and incur charges and credit in

---

[5]    Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times, July 16, 2010, available at http://www.nytimes.com/2010/07/18/business/18unboxed.html?_r=0 (last visited Oct. 10, 2017).

[6]    *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal, Feb. 28, 2011, available at http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited August 3, 2015).

[7]    Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), available at http://www.guanotronic.com/~serge/papers/isr10.pdf (last visited Oct. 10, 2017).

[8]    Il–Horn, Hann et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at table 3, available at http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited February 18, 2016).

00127458

a person's name.[9] As the GAO Report states, this type of identity theft is the most harmful because it may take time for the victim to become aware of the theft and can adversely impact the victim's credit rating.

24.    In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records … [and their] good name."

25.    According to the FTC, identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[10] Identity thieves use personal information such as SSNs for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[11]

26.    With access to an individual's sensitive information, criminals are capable of conducting many nefarious actions. Besides emptying the victim's bank account, identity thieves also commit various types of government fraud, such as: (a) obtaining a driver's license or official identification card in the victim's name but with the thief's picture; (b) using the victim's name and SSN to obtain government benefits; and/or, (c) filing a

---

[9]    *See* United States Government Accountability Office, *Personal Information Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, available at http:///www.gao.gov/new.items/d07737.pdf (last visited Oct. 10, 2017).

[10]    *See* FTC Identity Theft Website: www.consumer.ftc.gov/topics/identity-theft.html.

[11]    The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 CFR §603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number. *Id.*

00127458

fraudulent tax return using the victim's information.

27.    In addition, identity thieves may obtain a job using the victim's SSN, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant being issued in the victim's name.[12]

28.    A person whose personal information has been compromised may not see any signs of identity theft for years. According to the GAO Report:

> "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

29.    For example, in 2012, hackers gained access to LinkedIn's users' passwords. However, it was not until May 2016, four years after the breach, that hackers released the stolen email and password combinations.[13]

30.    "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[14] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market" for several years. Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison

---

[12]    *See* FTC Identity Theft Website, *supra.*

[13]    *See* https://blog.linkedin.com/2016/05/18/protecting-our-members.

[14]    *See John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) (citations omitted).

00127458

sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

31.      Companies, in fact, also recognize PII and other sensitive information as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market.[15] Likewise, Scottrade is well-aware of the value of the PII it maintains and its vulnerability to hackers. In the wake of the Data Breach at issue, Scottrade's notice warned customers to be "particularly vigilant against email or direct mail schemes seeking to trick you into revealing personal information." According to Scottrade, "We understand how important information security and privacy are to you."[16]

32.      As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, SSNs, PII and other sensitive information directly on various Internet websites making the information publicly available. In one study, researchers found hundreds of websites displaying stolen PII and other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism—the "Safe Browsing list." The study concluded:

> It is clear from the current state of the credit card black-market that cyber criminals can operate much too easily on the Internet. They are not afraid to put out their email addresses, in some cases phone numbers and other credentials in their advertisements. It seems that the black market for cyber criminals is not underground at all. In fact, it's very "in your face."[17]

---

[15]      Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html.

[16]      https://www.scottrade.com/documents/pdf/osc.pdf

[17]      http://www.stopthehacker.com/2010/03/03/the-underground-credit-card-blackmarket/

00127458

33.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

34.     It is within this context that Plaintiff and the nearly 4.6 million customers of Scottrade who relied on Scottrade's Privacy and Security policies must now live with the knowledge that their personal information is forever in cyberspace and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the black-market.

**SCOTTRADE FAILED TO HONOR ITS PROMISES AND OBLIGATIONS
TO PROTECT ITS CUSTOMERS' SENSITIVE PERSONAL INFORMATION**

35.     Scottrade is a discount retail brokerage firm that became popular in the late 1990's during the dot.com bubble based on its low $7.00 online trading platform.

36.     Scottrade provides both online and branch office services to its clients, including brokerage services, banking services, and retirement planning services for individuals and businesses.

37.     Scottrade's online trading website, the Scottrade Standard Trading Website, is used by millions of investors across the country to view their online statements for their brokerage and retirement accounts.

38.     When a customer opens an account with Scottrade, he or she must complete the Brokerage Agreement, which, by its terms, incorporates Scottrade's Privacy Statement (the "Privacy Statement"), which becomes part of the contractual relationship between

Scottrade and its customers.[18] Among other things, Scottrade collects names, addresses, phone numbers, social security numbers, work history and other personal identifying information.

39.    The Privacy Statement explains not only when Scottrade collects customers' personal information (when customers open an account or provide account information, make a wire transfer, or make deposits or withdrawals from their accounts, as well as periodically through third parties such as credit bureaus, affiliates and other companies), but also what kinds of personal and financial information it collects and shares, including Social Security numbers and employment information, account balances and transaction history, and credit history and investment experience.[19]

40.    Scottrade represents to customers, including via the Privacy Statement, and its Online Privacy Policy (described below), that it employs adequate safeguards to protect the personal identifying and financial information customers must provide to open an account.

41.    For example, the Privacy Statement states that "[t]o protect your personal information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[20]

42.    According to Scottrade's Privacy Statement, Scottrade collects personal information from customers during the following types of activities:

///

///

---

[18]    https://www.scottrade.com/documents/alt/PrivacyStatement.pdf

[19]    *Id.*

[20]    *Id.*

Open an account or provide account information • Give us your contact information or make a wire transfer • Make deposits or withdrawals from your account • We also collect your personal information from others, such as credit bureaus, affiliates or other companies.[21]

43.    Scottrade's Online Privacy Policy repeats and reinforces the representations that it employs adequate, and in fact, "industry leading security technologies, including layered security and access controls over personal information" to safeguard its customer's personal information. In its Online Privacy Policy, Scottrade represents to its customers:

**How We Protect Your Information**

We comply with applicable laws and regulations regarding the protection of personal information. We maintain physical, electronic and procedural safeguards that restrict access to your personal information. We use industry leading security technologies, including layered security and access controls over personal information. These safeguards are reviewed as necessary and may be adjusted in response to advances in technology and the latest security threats or trends.

Where we share personal information with a non-affiliated third party to assist us in providing financial services, we perform regular information security assessments to ensure that your personal information is protected. We also train our employees about privacy and our commitment to protect your personal information.[22]

44.    Furthermore, in a document entitled "Secure Online Investing & Identity Theft Protection," which is available on Scottrade's website, Scottrade represents:

**Take Control of Your Safety:**

At Scottrade, we take security seriously and use a variety of measures to protect your personal information and accounts. We keep all customer information confidential and maintain strict physical, electronic and procedural safeguards to protect against unauthorized access to your information.

---

[21]    *Id.*

[22]    https://www.scottrade.com/disclosures/onlineprivacy.html (last accessed Oct. 10, 2017).

15

Scottrade is committed to constantly updating its practices to stay ahead of identity thieves. Using **VeriSign Identity Protection Fraud Detection Service**, for example, Scottrade automatically checks your account for signs of activity from a foreign computer.[23]

45.     Indeed, Scottrade recognizes that "[a]ccount numbers, Social Security numbers and other pieces of personal information can all be used to commit fraud."

46.     Scottrade pays for its promised data security from its revenues including the fees it receives from its customers when executing trades. Each time a customer executes a trade, Scottrade receives a fee. A portion of the revenue it collects is used for data security.

47.     In using Scottrade as a broker to execute their trades, providing Scottrade with the required personal information, and paying Scottrade the required trading fee, Plaintiff and Class members bargained for, and expected to receive, data security measures safeguarding and protecting the privacy of their sensitive personal identifying and financial information.

48.     Plaintiff would not have opened an account with Scottrade, or would not have paid as much with respect to that account, had she known that Scottrade failed to take reasonable precautions to secure her personal identifying information and financial data.

49.     At all times relevant, Scottrade was obligated to comply with the terms of its own privacy policy, in accordance with the promises it made to Plaintiff and Class members. Plaintiff and Class members bargained for and expected the privacy and security of their information during the sign up process and through their customer agreement with Scottrade. Security of one's personal and financial data is central to the reasonable customer's decision to invest with Scottrade and provide them with their private and sensitive PII.

---

[23]     https://www.scottrade.com/online-brokerage/secure-trading.html (last accessed Oct. 10, 2017).

00127458

50.     Scottrade is also obligated by federal and state law to maintain adequate data security measures.

51.     Scottrade is prohibited by the FTC Act (15 U.S.C. §45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The FTC has found that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.[24]

52.     Under federal law, Scottrade also "has an affirmative and continuing obligation to respect the privacy of its customers and to protect the security and confidentiality of those customers' nonpublic personal information." 15 U.S.C. §6801(a).

53.     Florida state law similarly requires that Scottrade "take reasonable measures to protect and secure data in electronic form containing personal information." Fla. Stat. §501.171(2).

54.     In addition to its contractual promises and obligations under federal and state laws, Scottrade owed a duty to Plaintiff and Class members who entrusted Scottrade with their sensitive PII, to exercise reasonable care in retaining, securing, safeguarding, and protecting the PII. Scottrade owed a duty to create and maintain systems, databases, and networks containing Plaintiff's and Class members' PII that were not so easily and readily accessible by hackers. Scottrade also owed a duty to Plaintiff and Class members to act upon prior data security warnings and alerts in a timely and sufficient fashion.

---

[24]     *See*, *e.g.*, *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 249 (3d Cir. 2015).

00127458

55.    The Data Breach was the direct result of Scottrade's failure to comply with its contractual promises, obligations under state and federal law, and duties owed to Plaintiff and Class members.

### SCOTTRADE'S FAILURE TO TAKE REASONABLE
### SECURITY MEASURES RESULTED IN THE DATA BREACH

56.    On October 2, 2015, Bryan Krebs of "Krebs On Security" published an article alerting readers to the fact that Scottrade had just disclosed a breach involving confidential information of 4,600,000 million customers.[25]

57.    Mr. Krebs reported that an email was sent to customers of Scottrade that day stating that Scottrade had been the victim of cyber security crimes involving the theft of information from Scottrade and other financial service companies.[26]

58.    According to Mr. Krebs:

"In an email sent today to customers, St. Louis-based Scottrade said it recently heard from federal law enforcement officials about crimes involving the theft of information from Scottrade and other financial services companies.

'Based upon our subsequent internal investigation coupled with information provided by the authorities, we believe a list of client names and street addresses was taken from our system,' the email notice reads. 'Importantly, we have no reason to believe that Scottrade's trading platforms or any client funds were compromised. All client passwords remained encrypted at all times and we have not seen any indication of fraudulent activity as a result of this incident.'

The notice said that although Social Security numbers, email addresses and other sensitive data were contained in the system accessed, 'it appears that contact information was the focus of the incident.' The company said the unauthorized access appears to have occurred over a period between late 2013 and early 2014."

---

[25]    http://krebsonsecurity.com/2015/10/scottrade-breach-hits-4-6-million-customers/

[26]    *Id.*

00127458

59.    Mr. Krebs contacted Scottrade spokesperson Shea Leordeanu to inquire about the context of the notification from federal law enforcement officials concerning the actual date of the breach. In response, Ms. Leordeanu said the company could not comment on the incident much more than provide the information included in its website notice about the attack.[27] She did, however, state that "Scottrade learned about the date of theft from the FBI, and the company is working with agents from FBI field offices in Atlanta and New York."[28]

60.    Mr. Krebs correctly surmised that the intent of the intruders may have been to obtain Scottrade user data to facilitate stock scams, much like the J.P. Morgan Chase breach that occurred in 2014.

61.    Numerous online news sites reported that there may be a connection between the Scottrade attack and the 2014 J.P. Morgan Chase hack, which involved the exposure of the contact information of more than 76 million consumers.[29] As later confirmed, these reports were correct.

62.    The authorities have alleged that the email addresses were taken from J.P. Morgan Chase for the purpose of implementing stock manipulation schemes involving emails to pump penny stocks.

63.    As with Scottrade, according to the New York Times, the J.P. Morgan breach could have been prevented. In fact, it is detailed in the December 22, 2014 article:

> "Most big banks use a double authentication scheme, known as two-factor authentication, which requires a second one-time password to gain access to a protected system. But JPMorgan's security team had apparently neglected to

---

[27]    *Id.*

[28]    *Id.*

[29]    http://fortune.com/2015/10/02/scottrade-data-breach/

upgrade one of its network servers with the dual password scheme, the people briefed on the matter said. That left the bank vulnerable to intrusion.

* * *

The revelation that a simple flaw was at issue may help explain why several other financial institutions that were targets of the same hackers were not ultimately affected nearly as much as JPMorgan Chase was. To date, only two other institutions have suffered some kind of intrusion, but those breaches were said to be relatively minor by people briefed on the attacks.

What is clear is JPMorgan's attack did not involve the use of a so-called zero day attack – the kind of sophisticated, completely novel software bug that can sell for a million dollars on the black market. Nor did hackers use the kind of destructive malware that government officials say hackers in North Korea used to sabotage data at Sony Pictures.

* * *

It is not clear why the vulnerability in the bank's network had gone unaddressed previously. But this summer's hack occurred during a period of high turnover in the bank's cybersecurity team with many departing for First Data, a payments processor."[30]

64.     Scottrade was on notice of cyber-attack threats and the inadequacy of its own data security. As a result, Scottrade knew or should have known that Scottrade's data security was problematic and inadequate to prevent the Data Breach.

65.     Scottrade has been fined and publicly reprimanded on several occasions for failing to comply with industry standards regarding network security, as well as for failing to maintain proper supervisory mechanisms involving wire transfers:[31]

"FINRA also found that Scottrade failed to establish a reasonable supervisory system to monitor for wires to third-party accounts. From October 2011 to October 2013, Scottrade failed to obtain any customer confirmations for third-party wire transfers of less than $200,000, and Scottrade failed to ensure that the appropriate personnel obtained confirmations for third-party wire transfers of between $200,000 and $500,000.

---

[30]     http://dealbook.nytimes.com/2014/12/22/entry-point-of-jpmorgan-data-breach-is-identified/

[31]     http://www.thinkadvisor.com/2015/06/22/morgan-stanley-scottrade-fined-by-finra-for-failin

00127458

During that period, the firm processed more than 17,000 third-party wire transfers totaling more than $880 million.

"Firms must have robust supervisory systems to monitor and protect the movement of customer funds," Brad Bennett, executive vice president and chief of enforcement, said in a statement. "Morgan Stanley and Scottrade had been alerted to significant gaps in their systems by FINRA staff, yet years went by before either firm implemented sufficient corrective measures."

Both firms were cited for the weak supervisory systems by FINRA examination teams in 2011, but neither took necessary steps to correct the supervisory gaps."

66.     Notably, in November 2015—one month after Scottrade notified Plaintiff and Class members of the Data Breach—the Financial Industry Regulatory Authority ("FINRA") fined Scottrade $2.6 million for "Significant Failures in Required Electronic Records and Email Retention …."[32] Federal regulations require Scottrade to maintain business-related electronic records in non-rewritable, non-erasable format. 17 C.F.R. §140.17a-4(f)(2)(ii)(A). This is also referred to as "Write-Once, Read Many" or "WORM" format.[33] However, Scottrade did not follow these required practices during the Data Breach in late 2013 to early 2014:

FINRA found that from January 2011 to January 2014, Scottrade did not have centralized document-retention processes or procedures for all firm departments to follow. Further, no one at the firm was charged with responsibility for ensuring a consistent document-retention process, fully compliant with the record-retention rules, including the requirement that all records be retained in WORM format. Personnel in different departments of the firm saved certain documents to a restricted shared drive, which was not WORM-compliant.[34]

---

[32]     http://www.finra.org/newsroom/2015/finra-fines-scottrade-26-million-significant-failures-required-electronic-records-and

[33]     *Id.*

[34]     *Id.*

00127458

67.     In addition:

Over a related time frame, FINRA found that Scottrade also failed to copy
more than 168 million outgoing emails to the firm's WORM storage
device, resulting in the deletion of those emails. These emails were
generated automatically by the firm's internal systems or by third-party
vendors acting on Scottrade's behalf, and included items such as margin
call notices, address change notifications and failed password attempt
notifications.[35]

68.     In addition to the Data Breach at issue in this case, Scottrade allowed another

data breach in May 2014. According to MarketWatch.com, dated October 9, 2014, several

people hacked into Scottrade's customers' online brokerage accounts and made unauthorized

trades[36]

69.     With regard to the Data Breach, Scottrade admitted that its database and

systems were not sufficiently secured. In its October 2015 letter to customers, Scottrade

admitted that there was a clear "intrusion point" in the database and "steps to further

strengthen our network defenses" were required.

## THE DEPARTMENT OF JUSTICE REVEALS THE
## SCOPE OF THE DATA BREACH SCOTTRADE ALLOWED

70.     The Data Breach resulted from Scottrade's failure to comply with their

contractual promises and legal obligations to maintain the security of Plaintiff's and

Class members' sensitive PII.

71.     On November 10, 2015, the DOJ unsealed two indictments revealing the

Data Breach was part of an "orchestrated massive" scheme to hack Scottrade and other

financial institutions with large customer databases.

---

[35]     *Id.*

[36]     http://www.marketwatch.com/story/was-your-brokerage-account-hacked-heres-how-
to-know-2014-07-25

00127458

72. The DOJ's indictment confirms hackers successfully accessed and stole the Scottrade customer PII: "During at least in or about September 2013 to in or about February 2014, SHALON caused the unauthorized access to, and theft of customer data from, the computer network of [Scottrade]."

73. According to the DOJ indictment, the four hackers used the PII taken from Scottrade for various unlawful business enterprises. The DOJ described one of the ways in which the Scottrade hackers used Class members' PII:

> In particular, in an effort to artificially manipulate the price of certain stocks publicly traded in the United States, SHALON and his co-conspirators sought to market the stocks, in a deceptive and misleading manner, to customers of the victim companies whose contact information they had stolen in the intrusions. SHALON and his co-conspirators generated tens of millions of dollars in unlawful proceeds from these schemes.

74. For their security market manipulation schemes and other unlawful schemes, the Scottrade hackers relied on the PII they had stolen from Scottrade's customer databases:

> Nearly all of these schemes, like SHALON's securities market manipulation schemes, relied for their success on computer hacking and other cybercrimes committed by SHALON and his co-conspirators.

75. Hacker Gery Shalon (a/k/a "Garri Shalelashvili," "Gabi," "Gabriel," "Phillipe Mousset," and "Christopher Engeham") boasted about his use of the stolen PII. For example:

> SHALON described contacting and lying to people whose personal information had been obtained in the hacks, in the course of tricking those people into buying stocks being deceptively touted by the defendants. In particular, SHALON explained, individuals acting at SHALON's direction lied to people about how their personal contact information had been

23

obtained, falsely claiming that the information was simply "in our investors' database."

76. During at least in or about September 2013, to in or about February 2014, the hackers gained access to Scottrade's network, including Scottrade's customer databases. After obtaining access to Scottrade's customer databases, the hackers exported and used the customers' confidential PII.

77. As a result of Scottrade's failure to provide adequate security safeguards and protections, Scottrade's databases were an easy target. In or about October 2012, hacker Joshua Samuel Aaron (a/k/a Mike Shields) provided login credentials for a single Scottrade account to hacker Gery Shalon. Using the login credentials from just a single Scottrade account, the Scottrade hackers were able to gain access to Scottrade's internal enterprise networks.

78. Once inside Scottrade's networks, the hackers had the ability to move from application to application until they found the sensitive data they desired. The hackers discussed the PII visible on the Scottrade database and exported the PII to anonymous overseas servers setup by one of the hackers.

79. The hackers took the PII for the purpose of building their own competing customer database for marketing and brokering stock transactions.

80. The hackers went through the process of cleaning up and reformatting the PII and then generated reports from it.

81. The information was so readily available and accessible as a result of Scottrade's inadequate security safeguards, even surprising the hackers. For example, on or about September 5, 2013, hacker John Doe told hacker Shalon in an online chat that he

24

"found    passwords    to    scottrade.com    on    VPN." Hacker    Shalon    responded,
"wow … Seriously?"

82.    On or about September 8, 2013, hacker John Doe told hacker Shalon in an
online chat that he was still working and "need[ed] to pick open scottrade." Hacker Shalon
replied, "It will give us a very big push!" Hacker Shalon explained to hacker John Doe that
they were looking for "investors' databases …. The investors are looking for ways to make
money …. And we give them ways to make money."

83.    On or about November 19, 2013, hacker John Doe told hacker Shalon in an
online chat, "I am working on scottrade, I am trying to get in there. Seems to be working."
Hacker Shalon responded, "[y]es it will be a simple hit for us."

84.    On or about November 22, 2013, hacker John Doe told hacker Shalon in an
online chat that he was "browsing inside the [Scottrade] network now, looking for a
database."

85.    On or about November 23, 2013, hacker Shalon provided hacker John Doe
with login credentials for a Scottrade account. According to the DOJ indictment, less than an
hour after thanking hacker Shalon for providing login credentials, hacker John Doe located
Scottrade's customer database and reported to Hacker Shalon in an online chat, "6 mil users
there approx."

86.    On or about the next day, hacker Shalon replied, "Fuck that's a shitload :),"
and asked what data fields were visible. Hacker John Doe provided a full list of data fields in
Scottrade's confidential customer database, including names, email addresses, residential
addresses, and phone numbers.

25

87.     On or about November 23, 2013, the hackers uploaded four files containing customer PII taken from Scottrade's database.

88.     On or about November 25, 2013, hacker John Doe told hacker Shalon in an online chat that Scottrade also had a bank database, and hacker Shalon asked, "can we get it?" Hacker John Doe reported to hacker Shalon that he uploaded data for approximately 200,000 to 300,000 bank customers for hacker Shalon in a file.

89.     On or about November 27, 2013, hacker John Doe reported he took additional customer data from Scottrade.

90.     The hackers set up dozens of shell companies and used fake passports and other fraudulent credentials to maintain false identities.

91.     The hackers used and relied on the PII to operate a stock price manipulation scheme that amassed millions of dollars. They also operated a dozen illegal Internet gambling websites, multinational payment processors for illegal pharmaceutical suppliers, counterfeit and malicious software ("malware") distributors, and a Bitcoin exchange that generated millions more, according to authorities.

**SCOTTRADE'S NOTIFICATION OF THE 2-YEAR OLD DATA
BREACH AND OFFERED "REMEDY" ARE INADEQUATE AND
CREATE A BURDEN ON THE AFFECTED CUSTOMERS**

92.     In breach of its duties, Scottrade's security measures were not even sufficient to detect the hack, let alone prevent or minimize it. Until the federal government stepped in, Scottrade was unaware of the massive Data Breach.

93.     The FBI notified Scottrade of the Data Breach in August 2015.

00127458

94.     On approximately September 25, 2015, the FBI notified Scottrade that it could inform its customers about the Data Breach. Nevertheless, even then Scottrade waited an additional week to begin doing so.

95.     On October 2, 2015, possibly forced by media accounts of the breach, Scottrade began notifying Plaintiff and Class members about the Data Breach via email or mail, confirming the security breach of their personal and private information—that Scottrade received from them during the course of their investment relationship—including, but not limited to: (a) names; (b) addresses; (c) Social Security numbers; (d) employers' names; and (e) tax identification numbers.

96.     Many affected customers will not receive the Data Breach notice. For example, affected customers may have changed email or mailing addresses, or used alternative email addresses for personal and financial matters. Scottrade could have sent text messages, like J.P. Morgan Chase and other banks use to instantly notify customer of a fraud alert of breach of their secured account, but instead chose to send only an email or letter.

97.     The Data Breach notice is materially misleading and does not fully disclose to Scottrade customers the scope of the ongoing threat.

98.     For example, Scottrade vaguely advised the recipients of the notice that their personal information "*may* have been compromised" in 2013 through 2014. Scottrade also stated that it is not aware which specific personal customer information was actually taken during the Data Breach, but, according to Scottrade, "it appears contract information was the focus of the incident." The database accessed, however, contains, among other things, Social Security numbers, email addresses and other "***sensitive data***" (which is not defined in the

Data Breach notice). It is highly unlikely that the criminal hackers, having access to the above information, would only take the affected customer's name and email address.

99.     The Data Breach notice also failed to explain the breadth of the Data Breach and the potential threat that customer's face. For example, the number of customers affected is not listed in the notice, nor are there any disclosures about how the breach occurred or why their customer's personal information was not properly safeguarded and protected:

> "Federal law enforcement officials recently informed us that they've been investigating cybersecurity crimes involving the theft of information from Scottrade and other financial services companies. We immediately initiated a comprehensive response.

> Based upon our subsequent internal investigation coupled with information provided by the authorities, we believe a list of client names and street addresses was taken from our system. Importantly, we have no reason to believe that Scottrade's trading platforms or any client funds were compromised. All client passwords remained encrypted at all times and we have not seen any indication of fraudulent activity as a result of this incident.

> Although Social Security numbers, email addresses and other sensitive data were contained in the system accessed, it appears that contact information was the focus of the incident.

> The unauthorized access appears to have occurred over a period of several months between late 2013 and early 2014. We have secured the known intrusion point and conducted an internal data forensics investigation on this incident with assistance from a leading computer security firm. We have taken appropriate steps to further strengthen our network defenses."

100.     The Data Breach notice also squarely placed the burden on Plaintiff and Class members, rather than Scottrade, to protect themselves and mitigate their data breach damages. Scottrade instructed its customers to review their account statements, monitor their credit reports, and obtain fraud alerts:

> "As always, we encourage you to regularly review your Scottrade and other financial accounts and report any suspicious or unrecognized activity immediately. As recommended by federal regulatory agencies, you should remember to be vigilant for the next 12 to 24 months and report any suspected

incidents of fraud to us or the relevant financial institution. Please also read the important information included on ways to protect yourself from identity theft.

We encourage clients to be particularly vigilant against email or direct mail schemes seeking to trick you into revealing personal information. Never confirm or provide personal information such as passwords or account information to anyone contacting you. Please know that Scottrade will never send you any unsolicited correspondence asking you for your account number, password or other private information. If you receive any letter or email requesting this information, it is fraudulent and we ask that you report it to us at phishing@scottrade.com. Be cautious about opening attachments or links from emails, regardless of who appears to have sent them."

101.    The Data Breach notice states that Scottrade will provide one year of credit monitoring and identity theft insurance to affected persons. The offered "credit monitoring," however, is inadequate and requires affected customers to spend additional time and resources, including time filling out forms, and making phones calls to obtain full coverage:

We have arranged to have AllClear ID help you protect your identity for one year at no cost to you, effective Oct. 2, 2015. You are pre-qualified for AllClear SECURE identity repair and protection services and have additional credit monitoring options available with AllClear PRO, also at no cost to you.

AllClear SECURE: The team at AllClear ID is ready and standing by if you need identity repair assistance. This service is automatically available to you with no enrollment required. If a problem arises, simply call 855.229.0083 and a dedicated investigator will do the work to recover financial losses, restore your credit and make sure your identity is returned to its proper condition.

AllClear PRO: This service offers additional layers of protection including credit monitoring and a $1 million identity theft insurance policy. To use the PRO service, you will need to provide your personal information to AllClear ID. You may sign up online at https://scottrade.allclearid.com or by phone by calling 855.229.0083.

This hotline is available from 8:00 am to 8:00 pm (central) Monday through Saturday.

Please note: Additional steps may be required by you in order to activate your phone alerts and monitoring options.

00127458

102.    The one-year credit monitoring offered by Scottrade also does not provide comprehensive protection to the affected customers. Scottrade does not disclose this important fact. For example, the limited one-year offer does not include monitoring the online black market for identity theft.

103.    Many of Scottrade's other mitigation suggestions also require Plaintiff and the Class to incur additional time and out-of-pocket expenses to protect themselves from the Data Breach.

Review Your Accounts and Credit Reports

Regularly review statements from your accounts and periodically obtain your credit report from one or more of the national credit reporting companies.

You may obtain a free copy of your credit report online at www.annualcreditreport.com by calling toll-free 1.877.322.8228, or by mailing an Annual Credit Report Request Form (available at www.annualcreditreport.com) to: Annual Credit Report Request Service. P.O. Box 105281, Atlanta, GA, 30348-5281. You may also purchase a copy of your credit report by contacting one or more of the three national credit reporting agencies listed below.

- Equifax, P.O. Box 740241, Atlanta, Georgia 30374-0241.
  1.800.685.1111. www.equifax.com
- Experian, P.O. Box 9532, Allen, TX 75013,
  1.888.397.3742. www.experian.com
- TransUnion, 2 Baldwin Place, P.O. Box 1000, Chester, PA 19016.
  1.800.916.8800.www.transunion.com

104.    Scottrade's Data Breach notice also states "You may wish to consider contacting the fraud department of the three major credit bureaus to request a 'fraud alert' be placed on your file." Scottrade's Data Breach notice does not disclose the important fact that because the theft occurred two years ago a fraud alert is not likely effective. Moreover, Scottrade's Data Breach notice does not disclose that a fraud alert may not prevent the

misuse of existing accounts, and for that reason the FTC still recommends "You still need to monitor all bank, credit card and insurance statements for fraudulent transactions."[37]

105.    Scottrade's Data Breach notice also states "You may wish to request a security freeze on your credit reports." As a general rule, the fee to place a "security freeze" on one's credit report, as suggested by the Data Breach notice, is approximately $5-$10 each time it is placed at each of the three credit reporting agencies (Experian, Equifax, and TransUnion). Thereafter, in order to allow anyone check your credit, there is also an associated fee each time to lift the freeze. Moreover, if an identify thief has already used data to open accounts, then a credit freeze will not provide any benefits. A credit freeze also does not prevent identity thieves from making changes to existing accounts.

106.    Monitoring one's credit reports, another option suggested by the Data Breach notice, would cause an affected Scottrade customer to incur an expense to see her or her credit reports beyond the one free annual report to which they are entitled.

107.    Affected customers are also instructed to place fraud alerts. Because Scottrade let the Data Breach go undetected for two years, a fraud alert may not be useful. Scottrade does not disclose this important fact. Furthermore, placing fraud alerts also costs Scottrade's customers additional money and time:

> Consider Placing a Fraud Alert
>
> You may wish to consider contacting the fraud department of the three major credit bureaus to request that a "fraud alert" be placed on your file. A fraud alert notifies potential lenders to verify your identification before extending credit in your name.

---

[37]     http://www.consumer.ftc.gov/articles/0497-credit-freeze-faqs

31

108.    Scottrade has never advised customers to change their account passwords. To the contrary, Scottrade's Data Breach notice informed customers "all client passwords remained encrypted at all times." This statement is vague, misleading, and provides Scottrade's customers with a false sense of security. Encryption is not an iron-clad promise, particularly where, as here, the thieves perpetrate a series of data breaches and have boasted and demonstrated that they will use the information for their wide variety of unlawful business ventures. Accordingly, security strategists believe Scottrade customers should perform a careful review of their account records, and change their password" on both the Scottrade website and any other websites where they may have used the same credentials.[38]

109.    Although Scottrade knew about the vulnerabilities of its online network and lack of internal supervisory mechanisms, Scottrade continued to represent and promise that client's personal and private information was safe and secure.

110.    At all relevant times, Scottrade designed and implemented its policies and procedures regarding the security of protected financial information and sensitive information. These policies and procedures failed to adhere to reasonable and best industry practices in safeguarding protected health information and other sensitive information.

111.    As customers of Scottrade, Plaintiff and the Class members provided Scottrade with their PII, as required under their service agreements with Scottrade. Plaintiff and Class members relied on Scottrade to keep their sensitive information safeguarded and otherwise confidential.

---

[38]    http://www.eweek.com/security/scottrade-misses-breach-until-notified-by-fbi-2-years-later.html;  http://arstechnica.com/security/2015/10/scottrade-breach-exposes-sensitive-data-for-4-6-million-customers/

00127458

112.    A portion of the brokerage fees charged by Scottrade, on a per order basis, contributed to Scottrade's cybersecurity measures.

113.    Scottrade's wrongful actions, inaction, omissions, and want of ordinary care in failing to completely and accurately notify Plaintiff and the Class about the data breach and corresponding unauthorized release and disclosure of their personal information was arbitrary, capricious and in derogation of Scottrade's duties to Plaintiff and the Class.

## CLASS ALLEGATIONS

114.    Plaintiff brings this class action lawsuit on behalf of herself and all other members of the Class (the "Class") defined as follows:

> All Florida residents whose personal or financial information was compromised as a result of the data breach first disclosed by Scottrade on or about October 2, 2015.

115.    Excluded from the Class are: (a) Scottrade and its officers, directors, employees, principals, affiliated entities, controlling entities, agents, and other affiliates; (b) the agents, affiliates, legal representatives, heirs, attorneys at law, attorneys in fact, or assignees of such persons or entities described herein; and (c) the Judge(s) assigned to this case and any members of their immediate families.

116.    **Numerosity.** Scottrade is one the largest brokerages in the country. While the exact number of Class members are unknown, Scottrade has admitted the personal information, including names, mailing addresses, phone numbers, and email addresses of approximately 4,600,000 million customers was taken during the Data Breach. Plaintiff therefore believes that the Class is so numerous that joinder of all members is impractical.

00127458

117.    **Typicality.** Plaintiff's claim is typical of the claims of the Class. Plaintiff and the Class members were injured by the same wrongful acts, practices, and omissions committed by Scottrade, as described herein. Plaintiff's claim therefore arises from the same practices or course of conduct that give rise to the claims of all Class members.

118.    **Commonality.** Common questions of law and fact exist as to all Class members and predominate over any individual questions. Such common questions include, but are not limited to:

(a)    Whether Scottrade has engaged in unconscionable, unfair or deceptive acts or practices;

(b)    Whether Scottrade has engaged in the wrongful conduct alleged herein;

(c)    Whether Scottrade used reasonable or industry standard measures to protect Class members' personal and financial information;

(d)    Whether Scottrade adequately or properly segregated its network so as to protect personal customer data;

(e)    Whether Scottrade knew or should have known prior to the security breach that its network was susceptible to a potential data breach;

(f)    Whether Scottrade should have notified the Class that it does not use reasonable and best practices, safeguards, and data security measures to protect customers' personal and financial information;

(g)    Whether Scottrade should have notified Class members that their personal and financial information would be at risk of unauthorized disclosure;

(h)    Whether Scottrade intentionally failed to disclose material information regarding its security measures, the risk of data interception, and the ongoing Data Breach;

(i)    Whether Scottrade's acts, omissions, and nondisclosures were intended to deceive Class members;

(j)    Whether Scottrade's conduct violated the laws alleged;

34

00127458

(k)    Whether Plaintiff and the Class members are entitled to restitution, disgorgement, and other equitable relief; and

(l)    Whether Plaintiff and the Class members are entitled to recover actual damages, statutory damages, and punitive damages.

119.    **Adequacy.** Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests which are adverse to or conflict with those of the Class members Plaintiff seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

120.    **Superiority.** A class action is superior to any other available method for the fair and efficient adjudication of this controversy since individual joinder of all Class members is impractical. Furthermore, the expenses and burden of individual litigation would make it difficult or impossible for the individual members of the Class to redress the wrongs done to them, especially given that the damages or injuries suffered by each individual member of the Class may be relatively small. Even if the Class members could afford individualized litigation, the cost to the court system would be substantial and individual actions would also present the potential for inconsistent or contradictory judgments. By contrast, a class action presents fewer management difficulties and provides the benefits of single adjudication and comprehension supervision by a single court.

## **FIRST CAUSE OF ACTION**

### **Breach of Contract**

121.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

00127458

122. When Plaintiff and Class members provided their personal and financial information to Scottrade in order to receive the company's services, they entered into express contracts with Scottrade pursuant to which Scottrade agreed to safeguard and protect such information from being compromised. These were material terms of the contract, and not mere recitals.

123. Specifically, Scottrade promised to: (a) "use security measures that comply with federal law"; (b) "comply with applicable laws and regulations regarding the protection of personal information"; (c) "maintain physical, electronic and procedural safeguards that restrict access to your personal information;" (d) "use industry leading security technologies"; and (e) review its safeguards "as necessary" and "adjust[] [them] in response to advances in technology and the latest security threats or trends."

124. Scottrade solicited Plaintiff and Class members to sign up with Scottrade and to provide their personal and financial information. Plaintiff and Class members also paid money to Scottrade based on Scottrade's express representations concerning the safeguarding and protection of personal information.

125. Plaintiff and Class members fully performed their obligations under the contracts with Scottrade.

126. Scottrade breached the contracts by not complying with applicable laws and regulations as described herein, not maintaining physical, electronic and procedural safeguards to restrict access to Plaintiff's and Class members' PII, not using industry leading security technologies, and not reviewing its data security measures in response to the latest security threats or trends. In particular, Scottrade: (a) did not "take reasonable measures to

00127458

protect and secure data in electronic form containing personal information" as is required by Fla. Stat. §501.171(2); (b) committed an "unfair practice" in violation of the FTC Act (15 U.S.C. §45) by failing to maintain reasonable and appropriate data security for consumers' PII; (c) did not "respect the privacy of its customers [or] protect the security and confidentiality of those customers' nonpublic personal information" in violation of 15 U.S.C. §6801(a); (d) left Plaintiff's and Class members' PII vulnerable and easily accessible by hackers; (e) failed to adjust its data security procedures and safeguards based on previous breaches; and (f) failed to detect the Data Breach while it was occurring over the course of five months and make appropriate adjustments to its data security procedures and safeguards.

127. Scottrade's failure to satisfy its promises and obligations led directly to the Data Breach in which Scottrade allowed unauthorized persons to access and take Plaintiff's and Class members' PII over the course of several months without detection. Plaintiff and Class members had their personal and financial information compromised as a result of the Data Breach.

128. As a result of Scottrade's failure to implement the security measures required by contract, Plaintiff and the Class members have suffered and will continue to suffer damages as the result of Scottrade's breach, including the monetary fees that Plaintiff and Class members paid to Scottrade.

129. The losses and damages sustained by Plaintiff and Class members as described herein were the direct and proximate result of Scottrade's breaches of the contracts between it and Plaintiff and Class members.

00127458

**SECOND CAUSE OF ACTION**

**Breach of Implied Contract**
**(In the Alternative to the First Cause of Action)**

130.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

131.    Plaintiff brings this cause of action in the alternative to the First Cause of Action, and to the extent that an express contract is not found to exist between Scottrade on the one hand, and Plaintiff and Class members on the other.

132.    When Plaintiff and Class members provided their personal and financial information to Scottrade in order to receive the company's services, they entered into implied contracts with Scottrade pursuant to which Scottrade agreed to safeguard and protect such information from being compromised.

133.    Scottrade solicited Plaintiff and Class members to sign up with Scottrade and to provide their personal and financial information. Plaintiff and Class members accepted Scottrade's offer and provided their personal and financial information. Plaintiff and Class members paid money to Scottrade to protect and safeguard their personal information and confidentiality. The PII Plaintiff and Class members provided to Scottrade was valuable to Scottrade, as it was used by Scottrade to perform services for Plaintiff and Class members and also for its own purposes.

134.    Plaintiff and Class members would not have provided and entrusted their financial and personal information to Scottrade in the absence of the implied contracts.

135.    Plaintiff and Class members fully performed their obligations under the implied contracts with Scottrade.

00127458

136.    In the contracts, Scottrade promised to use industry leading measures to safeguard and protect Plaintiff's and Class members' PII.

137.    Scottrade breached the implied contracts by not complying with applicable laws and regulations as described herein,  not maintaining physical, electronic and procedural safeguards to restrict access to Plaintiff's and Class members' PII, not using industry leading security technologies, and not reviewing its data security measures in response to the latest security threats or trends. In particular, Scottrade: (a) did not "take reasonable measures to protect and secure data in electronic form containing personal information" as is required by Fla. Stat. §501.171(2); (b) committed an "unfair practice" in violation of the FTC Act (15 U.S.C. §45) by failing to maintain reasonable and appropriate data security for consumers' PII; (c) did not "respect the privacy of its customers [and] protect the security and confidentiality of those customers' nonpublic personal information" in violation of 15 U.S.C. §6801(a); (d) left Plaintiff's and Class members' PII vulnerable and easily accessible by hackers; (e) failed to adjust its data security procedures and safeguards based on previous breaches; and (f) failed to detect the Data Breach while it was occurring over the course of five months and make appropriate adjustments to its data security procedures and safeguards.

138.    Scottrade's failure to fulfill its implied contractual obligations resulted in Plaintiff and the Class members PII being taken and receiving services of far less value than what was promised, *i.e.*, services that included adequate protection of confidential information. Accordingly, Plaintiff and the Class members did not receive the full benefit of their bargain.

00127458

139.    Plaintiff and the Class members have suffered and will continue to suffer damages as the result of Scottrade's breach.

140.    The losses and damages sustained by Plaintiff and Class members as described herein were the direct and proximate result of Scottrade's breaches of the implied contracts between it and Plaintiff and Class members.

## THIRD CAUSE OF ACTION

### Unjust Enrichment / Assumpsit

141.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

142.    Plaintiff brings this cause of action in the alternative to the First Cause of Action, and to the extent that an express contract is not found to exist between Scottrade on the one hand, and Plaintiff and Class members on the other.

143.    By its above-described wrongful actions, inaction, and/or omissions that directly and/or proximately caused the Data Breach—to wit, Scottrade's failure to identify, implement, maintain and monitor the proper data security measures, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII—Scottrade holds money conferred on it by Plaintiff and Class members, *i.e.*, that portion of the fees they paid Scottrade for brokerage and other financial services, allocable to the protection of their PII that Scottrade failed to do. Scottrade has been (and continues to be) unjustly enriched by the funds it should have spent to safeguard and protect Plaintiff's and Class members' PII that Scottrade otherwise pocketed that, in equity and good conscience, belongs to Plaintiff and Class

members, and should be refunded because Scottrade failed to protect their PII.

144.    Scottrade also continues to be unjustly enriched by, *inter alia*, (a) the saved cost of implementing the proper PII security measures, policies, procedures, protocols, and software and hardware systems in its computer system and servers, which it did not implement, (b) the shifted risk and expense of the Data Breach to Plaintiff and Class members, and (c) the return on investment on all above-described amounts.

145.    Scottrade, therefore, should be compelled to refund (or disgorge) such wrongfully collected, saved back and/or shifted funds and expenses under the common law equitable doctrine of assumpsit.

## FOURTH CAUSE OF ACTION

### Violations of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. §501.201, *et seq.*)

146.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein.

147.    This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §501.201, *et seq.* ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public … from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. §501.202(2).

148.    Florida Statute §501.204(1) declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

41

00127458

149.    Scottrade's unconscionable, unfair, and deceptive acts and omissions took place in the conduct of trade or commerce by "providing [or] offering … any service." Fla. Stat. §501.203(8).

150.    Plaintiff is a "consumer" as defined by Florida Statute §501.203.

151.    Defendant has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers by knowingly failing to design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect Plaintiff's and Class members' PII. A portion of the money Plaintiff and the Class members paid to Scottrade was for protection of their PII, which Scottrade failed to protect, as alleged herein. Plaintiff and the Class members paid for this protection and collecting and protecting the PII was a part of and related to Scottrade providing other services to Plaintiff and the Class members.

152.    Plaintiff and the Class have been aggrieved by Defendant's unfair and deceptive practices and acts of false advertising in that they have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*, (a) an imminent, immediate and the continuing increased risk of identity theft and identity fraud; (b) invasion of privacy; (c) breach of the confidentiality of their PII; (d) deprivation of the value of their PII, for which there is a well-established national and international market; (e) failure to receive the full benefit of their bargain as a result of receiving brokerage and financial services that were less valuable than what they paid for; and/or (f) the financial

00127458

and/or temporal cost of monitoring their credit, monitoring their financial accounts, and mitigating their damages.

153.    The harm suffered by Plaintiff and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendant, as more fully described herein.

154.    Pursuant to Fla. Stat. §501.211(1), Plaintiff and the Class seek an order for restitution and disgorgement.

155.    Unless restrained and enjoined, Scottrade will continue to engage in the above-described wrongful conduct and more data breaches will occur. Plaintiff, therefore, on behalf of herself, Class members, and the general public, also seeks an injunction prohibiting Scottrade from continuing such wrongful conduct, and requiring Scottrade to modify its corporate culture and design, adopt, implement, control, direct, oversee, manage, monitor and audit appropriate data security processes, controls, policies, procedures protocols, and software and hardware systems to safeguard and protect the PII entrusted to it, as well as all other relief the Court deems appropriate, consistent with Fla. Stat. §501.211.

156.    Additionally, pursuant to Fla. Stat. §§501.211(2) and 501.2105, Plaintiff and the Class make claims for damages, attorneys' fees and costs.

## FIFTH CAUSE OF ACTION

### Fraudulent Inducement in Contract

157.    Plaintiff re-alleges and incorporates by reference all paragraphs as if fully set forth herein

43

00127458

158.    Scottrade entered into an agreement with Plaintiff and Class members to provide adequate data security of the PII Plaintiff and Class members provided to Scottrade. The agreement was the result of Scottrade's material misrepresentations regarding data security. Scottrade misrepresented to Plaintiff and Class members that Scottrade would take adequate data protection measures and safeguards. These representations were material to Plaintiff and Class members and Scottrade intended that Plaintiff and Class members rely on them in providing their sensitive PII to Scottrade. Plaintiff and Class members would not have provided their sensitive PII to Scottrade had they known Scottrade's data security and protection were not as represented.

159.    Scottrade knew or should have known that its data security and protection were inadequate, failed to take any measures to rectify its data security and protection prior to the Data Breach and thus, is representations to Plaintiff and Class members were false.

160.    Plaintiff and Class members were damaged by justifiably relying on Scottrade's misrepresentations regarding data security.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all persons and consumers similarly situated, pray for judgment as follows:

A.    An Order certifying the proposed Class defined herein, designating Plaintiff as representative of said Class, and appointing the undersigned counsel as Class Counsel;

B.    For restitution of all amounts obtained by Scottrade as a result of its wrongful conduct in an amount according to proof at trial, plus pre-judgment and post-

00127458

judgment interest thereon;

C.    For all recoverable compensatory, consequential, actual, punitive and/or statutory damages in the maximum amount permitted by law;

D.    For punitive and exemplary damages;

E.    For other equitable relief;

F.    For such injunctive relief, declaratory relief, orders, or judgment as necessary or appropriate to prevent these acts and practices;

G.    For payment of attorneys' fees and costs of suit as allowable by law; and

H.    For all such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

Dated: October 10, 2017

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD (*pro hac vice*)
THOMAS J. O'REARDON II (*pro hac vice*)
PAULA R. BROWN (*pro hac vice*)

*s/ Timothy G. Blood*
TIMOTHY G. BLOOD (*admitted pro hac vice*)

701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com
toreardon@bholaw.com
pbrown@bholaw.com

DOGALI LAW GROUP, P.A.
ANTHONY DOGALI (615862)
101 E. Kennedy Blvd., Suite 1100
Tampa, FL 33602
Tel: 813/289-0700
813/289-9435 (fax)

00127458

adogali@dogalilaw.com

SIPRUT PC
JOSEPH J. SIPRUT (*pro hac vice*)
RICHARD L. MILLER II (*pro hac vice*)
RICHARD S. WILSON (*pro hac vice*)
17 North State Street, Suite 1600
Chicago, IL 60602
Tel: 312/236-0000
312/878-1342 (fax)
jsiprut@siprut.com
rmiller@siprut.com
rwilson@siprut.com

COHELAN KHOURY & SINGER
TIMOTHY D. COHELAN (*pro hac vice*)
J. JASON. HILL (*pro hac vice*)
605 C Street, Suite 200
San Diego, CA  92101
Tel: 619/595-3001
619/595-3000 (fax)
tcohelan@ckslawfirm.com
jhill@ckslaw.com

SPRETER LAW FIRM, APC
GEOFF SPRETER (257707CA)
402 W. Broadway, Suite 860
San Diego, CA  92101
Tel: 619/865-7986
geoff@spreterlaw.com

*Attorneys for Plaintiff Angela Lynn Martin*

00127458

**CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2017, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the Electronic Mail Notice List.

Executed on October 10, 2017, at San Diego, California.

s/  Timothy G. Blood

TIMOTHY G. BLOOD (*admitted pro hac vice*)
Attorney for Plaintiff Angela Lynn Martin

701 B Street, Suite 1700
San Diego, CA  92101
Tel: 619/338-1100
619/338-1101 (fax)
tblood@bholaw.com

47

00127458